*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 78**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LOUISE PORENTA,
*Appellant,*

*v.*

PATRICIA PORENTA,
*Appellee.*

No. 20160243
Filed November 15, 2017

On Direct Appeal

Third District, Salt Lake Dep't
The Honorable Andrew H. Stone
No. 080923394

Attorneys:

Stephen A. Starr, Layton, for appellant

Jennifer P. Lee, Salt Lake City, for appellee

JUSTICE DURHAM authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PEARCE, and
JUDGE MORTENSEN joined.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion.

Having recused himself, JUSTICE HIMONAS does not participate
herein; COURT OF APPEALS JUDGE DAVID N. MORTENSEN sat.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1 Patricia and Robert Porenta were married for approximately seventeen years before the couple filed for divorce. During the divorce proceedings, Robert transferred his interest in the couple's marital home to his mother with the intent to avoid Patricia's claim to the home. After transferring his interest in the home, Robert died and the divorce case was dismissed for lack of jurisdiction. Patricia filed this action against Robert's mother alleging that the transfer

was fraudulent under the Utah Fraudulent Transfer Act and sought to gain full ownership of the home. On appeal, both parties concede that the transfer was fraudulent at the time it was made. Robert's mother merely argues that the debtor-creditor relationship was extinguished when Robert died, and that the Utah Fraudulent Transfer Act requires an ongoing debtor-creditor relationship when a claim under the act is filed, therefore entitling her to retain her interest in the home. Robert's mother also argues that the only remedy available under the act is an award of money damages rather than the return of the fraudulently transferred asset. While we hold that an ongoing debtor-creditor relationship is required, we affirm the district court's grant of the marital home to Patricia.

## BACKGROUND

¶2 The plaintiff, Patricia Porenta (Wife), married Robert Porenta (Husband) in 1988. During their marriage, the couple purchased a home as joint tenants. After the home was purchased the couple began having marital problems, and in November 2005, Wife filed for divorce. The disposition of the home was at issue in the divorce as part of the distribution of the marital estate. During the divorce proceedings, Husband filed a motion asking the divorce court for an order to list and sell the home, with the net proceeds to be held in escrow pending distribution by the court or by written agreement of Husband and Wife.

¶3 Seven days after filing his motion, Husband executed a quit claim deed transferring "an undivided 01/100th share of" Husband's interest in the home to himself and his mother, Louise Porenta (Mother), a defendant in the current action, as joint tenants. The deed transferred the remaining "undivided 99/100th share of" Husband's interest in the home to Mother as a tenant in common. Seven days after executing the quit claim deed, Husband filed a reply memorandum in support of his original motion to sell the home. In the reply memorandum, Husband stated that "[o]nce the home is listed, either side has the option of buying it. . . . If [Wife] wants the house, she can buy it. Proceeds can then be paid into escrow pending equitable division or by a court order." The reply memorandum does not disclose that Husband had already fraudulently transferred a large portion of his interest in the home to Mother, retaining only a minor fraction for himself.

¶4 The divorce court held a hearing on Husband's motion, with Husband, Wife, and Mother present. Husband continued to represent to Wife and the divorce court that the home was still within the marital estate under the jurisdiction of the divorce court, and that he desired to sell the home and leave the proceeds in

escrow. The divorce court denied Husband's motion, and reserved the issue of the sale of the home until trial unless a "danger of loss" arose.

¶5 Wife discovered the transfer to Mother in the spring of 2008, roughly one and a half years after Husband executed the quit claim deed. Then, in September 2008, while the divorce case was still pending before the divorce court, Husband died. The divorce court subsequently dismissed the case for lack of jurisdiction.

¶6 Shortly thereafter, Wife filed the current action against Mother, asking the trial court to set aside the quit claim deed under the Utah Fraudulent Transfer Act (UFTA).[1] Mother answered and counterclaimed, alleging that the transfer was repayment of $200,000 in loans she had made to the couple.[2]

¶7 In September 2014, a trial was held on whether the transfer to Mother was fraudulent and whether the home should be awarded to Wife. Nine days before the trial on Wife's UFTA claim, without any disclosure to Wife or the court, Mother executed a quit claim deed purporting to transfer the entire home to Diamond Fork Land & Livestock Company. This company, according to Mother, is owned by Robert Copier, the attorney who represented Husband in the underlying divorce case and represented Mother at the beginning of the present action. At the September trial, Mother again did not disclose the transfer to Diamond Fork. Rather, she actively concealed the fact that she had transferred all of her interest a week before the trial. During the September trial, Mother suffered from a medical issue and was transported to the hospital. The trial was continued, and Wife later learned of the transfer from Mother to Diamond Fork. Wife then amended her complaint to include a claim under UFTA that Mother had fraudulently transferred her interest in the home to Diamond Fork and Robert Copier.

---

[1] The Uniform Fraudulent Transfer Act was amended, renumbered, and renamed as the Uniform Voidable Transactions Act, effective May 6, 2017. S.B. 58, 62nd Leg., Gen. Sess. (Utah 2017). This amendment did not take effect until after all of the facts in this case took place and oral arguments were already completed before this court. For these reasons, we apply the 2016 version of UFTA instead of the Uniform Voidable Transactions Act. All citations to the Utah Code are from the 2016 version unless otherwise noted.

[2] Mother also sought other relief that is not at issue in this appeal.

¶8  Trial finally resumed in November 2015, seven years after the original complaint had been filed. The trial court ultimately held that Husband's transfer to Mother was fraudulent under UFTA. Additionally, the trial court awarded Wife her attorney fees because of Mother's misconduct during trial. Diamond Fork and Robert Copier defaulted, and the trial court found that Mother's "transfer to Diamond Fork Land & Livestock Company was an attempt to transfer the subject property beyond the jurisdiction of the court to avoid the remedy sought by" Wife. The trial court further found that Mother "filed at least sixty motions during the pendency of this case, many of them repeating previously denied motions." It held that Mother's "defenses were brought in bad faith, made with the intention of hindering or delaying restoration of the property to [Wife] or forcing [Wife] to abandon her case because of the legal fees required by [Mother's] paperwork blizzard for repetitive, baseless, unsupported motions." Mother appealed.

## STANDARD OF REVIEW

¶9  Mother appeals two issues. First, she argues that the Utah Fraudulent Transfer Act requires an ongoing debtor-creditor relationship when the action is filed, and that the death of Husband extinguished any such relationship prior to Wife filing her UFTA claim. Our interpretation of a statute is a question of law that we review for correctness. *Sill v. Hart*, 2007 UT 45, ¶ 5, 162 P.3d 1099. Whether a debtor-creditor relationship exists is an "application of a legal standard to a set of facts unique to a particular case." *In re Adoption of Baby B.*, 2012 UT 35, ¶ 42, 308 P.3d 382. Thus, it is a mixed question in which "our review is sometimes deferential and sometimes not." *Id.* The amount of deference we grant to a lower court is based to some extent on whether the question is more "fact-like" or more "law-like." *Id.* ¶¶ 43-47; *see also Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶¶ 28–29, 164 P.3d 384. The question of whether a debtor-creditor relationship is extinguished upon the death of the debtor during a divorce proceeding is more law-like, as the only real fact at issue is the death of the spouse. The remainder of the inquiry is a legal question, determining the effect of that death on the debtor-creditor relationship. Because this question is more law-like, we review this mixed question for correctness. *Adoption of Baby B.*, 2012 UT 35, ¶¶ 42, 44.

¶10  The second issue is whether UFTA authorized the trial court to award Wife with Mother's interest in the home, rather than awarding Wife money damages. This is a question of statutory interpretation, which we review for correctness. *Sill*, 2007 UT 45, ¶ 5.

## ANALYSIS

¶11 Mother raises two issues on appeal: 1) whether the death of Husband extinguished any debtor-creditor relationship, and 2) whether UFTA authorized the trial court to award Wife the entire home, or if it was limited to awarding Wife with money damages.[3]

---

[3] The dissent attempts to insert an entirely new issue into the appeal. It looks to UFTA's definition of "claim" to determine whether a property interest, such as the joint tenancy at issue in this case, can be a "right to payment." *Infra* ¶¶ 62, 77; *see also* UTAH CODE § 25-6-2(3) (stating that a "claim" is "a right to payment"). The dissent opines that a property interest cannot be a "right to payment," and therefore, Wife's interest in the joint tenancy cannot be a "UFTA Claim." *Infra* ¶¶ 77–81.

While this is a serious question, it is one that was never raised by either party. The issue raised and argued by Mother was simply whether "the requisite debtor/creditor relationship . . . terminated upon [Husband's] death." Mother argued broadly that Wife had no surviving claims when she filed her UFTA action because they were all extinguished when Husband died. She did not argue that property interests can never be "UFTA Claims." In fact, Mother conceded that Wife had a valid "UFTA Claim" at the time that Husband transferred his interest in the home to Mother. Mother argued that "a debtor/creditor relationship existed between Husband and Wife" as soon as Wife threatened divorce, but that the "abatement of the divorce action terminated any debtor/creditor relationship between Husband and Wife." Thus, Mother concedes that Wife's interest in the marital estate was sufficient to give rise to a "UFTA Claim," thereby creating a debtor-creditor relationship at the time Husband transferred the home to Mother. If it was a sufficient "UFTA Claim" at the time the asset was transferred, then Mother concedes it was a sufficient "UFTA Claim" at the time Wife filed her UFTA action so long as that claim survived the abatement of the divorce proceeding.

The dissent raises this new issue *sua sponte*. Our recent opinion in *State v. Johnson* outlines when an issue may be raised *sua sponte* by the court. 2017 UT 70, ¶¶ 49–53, --- P.3d ---. The dissent in this case does not engage in any of the analysis required under *Johnson*, nor does it request any additional briefing or argument on this issue. *Id.* ¶ 45 ("[A]n appellate court should typically allow some form of argument from the parties to 'test a notion of [the court's] own invention before using it to justify a reversal." (second alteration in original) (citation omitted)). We decline to address this issue.

(continued . . .)

Finally, Wife argues that she is entitled to attorney fees under Utah Rule of Appellate Procedure 33 because Mother's appeal was brought for an improper purpose. We address each issue in turn.

## I.   DEBTOR-CREDITOR RELATIONSHIP UPON DEATH OF A SPOUSE

¶12 The trial court held that the transfer from Husband to Mother was fraudulent under three different sections of UFTA: Utah Code sections 25-6-5, 25-6-6(1), and 25-6-6(2). All of these require a debtor-creditor relationship. UTAH CODE §§ 25-6-5, -6 (2016) (stating that a transfer by a "debtor is fraudulent as to a creditor" when certain requirements are met). A "debtor" is defined as "a person who *is* liable on a claim." *Id.* § 25-6-2(6) (emphasis added). A "creditor" is defined as "a person who *has* a claim." *Id.* § 25-6-2(4) (emphasis added). The existence of a claim, or right to payment, is at the heart of the debtor-creditor relationship. *See id.* § 25-6-2(3) (a claim is a "right to payment"). Both of these definitions use the present tense when discussing the claim, indicating that there must be a claim or right to payment held by the creditor against the debtor at the time a UFTA claim is filed. *See In re Discipline of Bates*, 2017 UT 11, ¶ 23, 391 P.3d 1039 (use of present tense informs our interpretation of rules and statutes); *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (when interpreting a statute, "[t]he best evidence of the legislature's intent is the plain language of the statute itself" (alteration in original) (citation omitted)).

¶13 UFTA's apparent purpose is to prevent insolvent debtors from transferring all of their assets to avoid their creditors' claims, and to provide a means whereby creditors can collect against a fraudulently transferred asset. *See* UTAH CODE §§ 25-6-5, -6. A creditor cannot typically execute against a fraudulently transferred asset under UFTA if the creditor no longer has a claim against the debtor because the debt has been satisfied or is otherwise no longer enforceable. *See Tolle v. Fenley*, 2006 UT App 78, ¶ 46, 132 P.3d 63 (Thorne, J., concurring in the result) ("The UFTA plaintiff herself must have some current claim against the grantor, as it is only the need to satisfy that claim that justifies revesting the property in the grantor." (citation omitted)); *but see Rupp v. Moffo*, 2015 UT 71, 358 P.3d 1060 (claim brought solely against transferee by bankruptcy

_____

(continued . . .)
Regardless, this opinion should not be construed to hold that property interests fit the definition of "claim;" we merely hold that this issue is not properly before us.

trustee where it could not have been brought against debtor because of bankruptcy).

¶14 In this case, the trial court held that "[t]he creditor-debtor relationship, and [Wife's] claim against [Husband], arose when [Wife] filed for divorce on November 10, 2005." It further held that Wife's underlying claim against Husband was for "the whole of the marital estate, including the right to preserve the joint tenancy or require [Husband] to convey his interest free and clear to [Wife]."

¶15 On appeal, Mother argues that the divorce court's orders for "child support and medical and insurance expenses" were vacated when Husband died.[4] Furthermore, she argues that the debtor-creditor relationship—based on the child support orders amounting to $20,086.63—between Husband and Wife was extinguished at Husband's death. (Relying on *Nelson v. Davis*, 592 P.2d 594, 597 (Utah 1979) ("[W]hen the death of one or both parties to a divorce action occurs during the pendency of the action, the action itself abates and their status, including their property rights, reverts to what it had been before the action was filed.")).

¶16 However, an order and a claim are two distinct things. A claim is "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional." *Claim*, BLACK'S LAW DICTIONARY (10th ed. 2014). An order or judgment is a court's adjudication of the viability of a claim. *Id. Order* ("A written direction or command delivered by a government official, esp. a court or judge."). Mother did not argue that the district court erred in holding that Wife had a claim to preserve the joint tenancy. Nor did she argue why that specific claim—the primary claim at issue in this case—abated upon Husband's death. She argues primarily that court orders that award a spouse with property abate upon the death of a spouse. Regarding claims, she simply makes the general statement that Wife's claims against Husband are unenforceable because Husband is dead and she cannot bring a claim against a dead person.

¶17 Whether court ordered child support versus a claim for a joint tenancy abate upon the death of a spouse are two very distinct

---

[4] Our only task is to determine whether there is an underlying claim to support Wife's UFTA claim. The divorce court entered these orders during the divorce case. Because we do not disturb the trial court's holding that Wife had an underlying claim for the joint tenancy, we do not address the impact of the divorce case's abatement on these orders.

questions. Utah courts have only ever wrestled with whether court orders dealing with property rights abate upon the death of a spouse. Whether a claim for equitable distribution or some other property claim survives the death of a spouse during a divorce proceeding has never been addressed by this court, and we decline to address it for the first time without adequate briefing. We first address our precedent discussing the effect of the death of a party on court orders entered during a divorce proceeding. Next, we address the effect of the death of a party on a claim that was or could have been brought against that party. Finally, we address some additional arguments that Mother raised for the first time during oral arguments concerning the debtor-creditor relationship.

### A. Utah's Treatment of Court Orders Dealing With Property Rights in Divorce Proceedings Where One Party Dies Prior to a Final Decree

¶18 We have previously addressed whether a court order addressing marital property survives the death of a party in a divorce proceeding, and we originally held that it does. In a string of cases we purportedly abandoned our original holding, but we now dismiss those cases as *dicta* and reaffirm our original holding that a court order dealing with marital property survives the death of a spouse.

¶19 A claim for equitable distribution arises when one party in a marriage threatens divorce. *See Bradford v. Bradford*, 1999 UT App 373, ¶¶ 14–16, 993 P.2d 887 (holding that a debtor-creditor relationship is created between husband and wife once divorce is threatened); *see also Dahl v. Dahl*, 2015 UT 79, ¶ 26, --- P.3d --- ("Utah law presumes that property acquired during a marriage is marital property subject to equitable distribution."). Once the parties file for divorce, the divorce court has the power to enter "equitable orders relating to the . . . property" belonging to the marital estate. UTAH CODE § 30-3-5(1). *See also Dahl*, 2015 UT 79, ¶ 25 ("Utah has a long-established policy in favor of the equitable distribution of marital assets in divorce cases."). "Thus, by legislative enactment and our long-standing precedent, Utah has an interest in ensuring that marital assets are fairly and equitably distributed during divorce and that divorcing spouses both retain sufficient assets to avoid becoming a public charge." *Dahl*, 2015 UT 79, ¶ 25. When one spouse transfers assets out of the marital estate during the divorce

proceeding with the intent to keep those assets out of the hands of their spouse, the equitable division of assets is frustrated.[5]

¶20 Our precedent has addressed what happens when a divorce court enters an order that relates to the marital property, but then a spouse dies before the final divorce decree is entered. Originally, a court order that divided marital property did not abate upon the death of a spouse before a final divorce decree could be entered. In *In re Harper's Estate*, this court held that

> [w]hen the death of one of the parties occurs after the entry of a divorce decree and before the decree is final the decree becomes ineffective to dissolve the marriage, death having terminated that personal relationship. However, *the occurrence of death does not abate the action itself and to the extent that property rights are determined by the decree it remains effective and becomes final . . . .*

265 P.2d 1005, 1006 (Utah 1954) (emphasis added). This appears to comport with the majority of jurisdictions. "The general rule followed in virtually all jurisdictions is that," after one of the spouses dies during a divorce proceeding, and "during the time an appeal is pending or during the time when an appeal may be taken, a divorce or dissolution action abates with respect to marital status of the parties but does not abate with respect to property interests affected by the decree." 27A C.J.S. *Divorce* § 194 (2017 update).[6]

---

[5] We note that the district court in this case held that Husband's transfer of his interest in the home "was made with actual intent to defraud, hinder or delay [Wife's] claim [for the home] against [Husband]." Mother concedes on appeal that Husband's transfer was fraudulent at the time it was made.

[6] *See, e.g., Bridgeman v. Bridgeman*, 391 S.E.2d 367, 369 (W. Va. 1990) ("[D]ivorce actions abate at death *except as to property rights. . . .* Thus, an alimony award that terminates on either party's death may not be appealed after a party's death; on the other hand, a lump-sum alimony award . . . may be appealed after a party's death, *because the award is chargeable against the estate.*" (emphases added)); *Van Emmerik v. Colosi*, 972 P.2d 1034, 1036 n.1 (Ariz. Ct. App. 1998) ("Although the [divorce] action abates," a "transfer of property in alleged violation of [a] preliminary injunction" remains as a "viable [claim] for resolution in the probate [court]."); *Goodloe v. LaRoche Indus., Inc.*, 686 So.2d 335, 337–38 (Ala. Civ. App. 1996) (stating that property rights at issue in a divorce proceeding are not abated upon

(continued . . .)

¶21 Despite this general agreement among jurisdictions, this court, without analysis, purportedly abandoned the majority approach in *Daly v. Daly*, 533 P.2d 884 (Utah 1975). In that case, this court applied the rule of *In re Harper's Estate*, but then prospectively reversed "that part of the decision in *In re Harper's Estate . . .* having to do with determination of property rights . . . ." *Id.* at 885. Despite this statement being pure *dictum*, as recognized in a separate opinion, *id.* at 886 (Crocket, J., concurring and dissenting), the majority went on to craft a new rule: "when the death of one or both of the parties occurs after the entry of a divorce decree and before the decree is final, the decree becomes ineffective and is deemed and held to be of no further force or effect," *id.* at 885–86. The court in *Daly* did this without any analysis and the statement did not affect the outcome of the case. "For a decision to become precedent and trigger stare decisis, it must be (1) [a] deliberate or solemn decision of a court or judge [2] made after argument of a question of law fairly arising in a case, and [3] necessary to its determination." *State v. Robertson*, 2017 UT 27, ¶ 25, --- P.3d --- (alterations in original) (citation omitted) (internal quotation marks omitted). Without affecting the ultimate decision of the case, the statement in *Daly* was not necessary to the court's determination and is clearly *dictum*.

¶22 This statement was mentioned in *Nelson v. Davis*, 592 P.2d 594 (Utah 1979). However, it was again applied in *dictum*. In that case, a mother going through a divorce executed a quit claim deed to her daughter and also executed a "Notice of Termination of Joint Tenancy." *Id.* at 596. This court held that both the deed and the notice of termination had no legal effect for various reasons and, therefore, neither the daughter nor the mother's estate had any interest in the home. The daughter raised an alternative contention that "even if she does not take by the deed, she should be entitled to succeed to her mother's interest in the property as the executrix of her estate." *Id.* at 597. This court stated that, from its prior analysis regarding the deed and notice of termination, "it is obvious that there was never any such conversion of the joint tenancy to a tenancy in common." *Id.* Thus, the husband "became the owner of the home as the surviving joint tenant," and the mother (and by extension, the mother's estate) did not have any interest in the home. *Id.* After holding that the mother and the mother's estate did not

(continued . . .)
the death of a party; rather, the action abates in regard to only the "marital *status* of the[] parties.") *overruled on other grounds by Banks v. Premier Serv. Co.*, 184 So. 3d 370 (Ala. Civ. App. 2014).

have any interest in the home, the court went on to state that even if the mother had acquired some other interest in the home during the divorce proceeding, "the death of one or both parties to a divorce action . . . during the pendency of the action [causes] the action itself [to] abate[] and [the married couple's] status, including their property rights, reverts to what it had been before the action was filed." *Id.* This was clearly *dictum* as it did not affect the outcome of the case. The court had already established that the joint tenancy was never severed and that the mother, and her estate, did not have any remaining interest in the home.

¶23 We abandon any implication that this statement was anything more than *dictum*. The dissenting opinion argues that this *dictum* from *Nelson* means that *all* court orders and *all* claims that arise in a divorce proceeding abate upon the death of a spouse.[7] *See infra* ¶ 60 ("[A]ny right or claim arising from the existence or threat of a divorce proceeding is extinguished upon the death of one of the spouses."). Even if *Nelson*'s statement wasn't *dictum*, it does not do the work that the dissent argues it does—it does much more. The dissent argues that this statement means that all claims arising from a divorce abate upon the death of a spouse. However, if we were to apply the meaning and intent of *Nelson*'s actual statement in this case, then the property rights of Husband and Wife would have reverted to "what [they] had been before the [divorce] action was filed." *Nelson*, 592 P.2d at 597. In *Nelson*, the mother held a joint tenancy in the home with her husband prior to the divorce proceeding. *Id.* at 595. The court used *Daly*'s *dictum* statement to say that, even if a tenancy in common had somehow been created or the mother had gained some other interest that could pass to her estate in the divorce, that interest was extinguished upon her death during the divorce proceeding and the parties' interest in the home

---

[7] In citing this *dictum* from *Nelson*, Mother argued that it only stands for the proposition that all *court orders* dealing with property rights abate upon the death of a party. Her opening brief argued that, "[i]t is important to note that the 'property rights' which revert upon abatement of the divorce action are only . . . those rights granted by the court via an order issued during the divorce." Wife countered that the only court orders that abate are interlocutory orders that do not have an element of finality. She conceded that an ongoing order for support payments would cease upon the death of the spouse. But she argued that orders instructing a spouse to pay a one-time support payment for a set amount should survive because there was "nothing [left] for further determination of the court."

"revert[ed] to what it had been before the action was filed." *Id.* at 597. *Nelson*'s *dictum* stands for the proposition that the parties' property interests in the marital estate are frozen in time during the pendency of divorce litigation.[8] If a party dies before the divorce becomes final, than the couple's status, including property rights in the marital estate, are transported back in time to what they held before the divorce case was filed. Thus, the only alteration in property rights that are available is a final divorce decree that divides the marital estate.

¶24 This court failed to apply this outcome in *In re Estate of Knickerbocker*, 912 P.2d 969 (Utah 1996). After overruling a portion of *Nelson* that is not at issue in this case, we stated that a litigant's property rights were not frozen by a divorce proceeding when a court order[9] prohibits the transfer of property out of the marital estate. *Id.* at 976. In that case, we held that a spouse could sever a joint tenancy and create a tenancy in common in the marital home because the home remained in the name of the spouse,[10] and thus,

---

[8] Mother tries to limit *Nelson*'s statement by arguing that it only unwinds court orders dealing with property rights. However, the language in *Nelson* did not limit it to court orders, and there was no court order granting property interests to the mother for the court to unwind. The *Nelson* court clearly intended the statement to unwind any severance of the joint tenancy that might have occurred during the divorce proceeding, even though it was entirely unnecessary to do so since it has just ruled that the mother's attempt to sever the joint tenancy had no effect under the then common law. 592 P.2d at 596–97.

[9] We note that no order was issued in the divorce court here prohibiting the transfer of the home. However, there was likely no order entered due to a fraud on the court. As mentioned above, Husband continually asserted that the home remained within the jurisdiction of the court. The divorce court refused to sell the home and divide the proceeds under the belief that it would remain in the court's jurisdiction, specifically stating that it would revisit the request to sell the home if a "danger of loss" arose. If the court had been aware that Husband considered transferring his interest in the home, it likely would have ordered the sale of the home or entered an order prohibiting him from taking such an action.

[10] The spouse in *Knickerbocker* eventually transferred her interest in the home to the trustees of her revocable trust. 912 P.2d at 972. However, we treated it the same as having the title in her own name

(continued . . .)

remained in the jurisdiction of the divorce court. *Id.* at 982. Such an outcome would not be available under the *Nelson dictum*. If we apply *Nelson* on its face then the severance of the joint tenancy would be ineffective because the parties would be placed back in their original positions upon the death of either spouse.

¶25 This was not the outcome in *Knickerbocker*, and for good reason. As we stated in *Knickerbocker*, a divorce case or any order prohibiting a transfer of marital property in a divorce case is not intended to "'freeze' the status of the parties' assets," or to "freeze each party's estate plan." 912 P.2d at 976. Parties subject to a court order similar to that in *Knickerbocker* are merely prevented from unilaterally dissipating the marital estate by transferring marital assets to a third party, thereby removing them from the jurisdiction of the divorce court and preventing equitable distribution of those assets.[11]

¶26 Before the divorce action was filed in this case, Husband and Wife were joint tenants. Wife did not acquire her interest as a joint tenant in the property during the divorce proceeding; it pre-existed as an interest that was part of the marital estate and was subject to equitable distribution. Under the *Nelson dictum*, we would be required to restore the joint tenancy. As joint tenants, Wife would have succeeded to Husband's interest in the home upon Husband's death. If the statements in *Nelson* are not *dictum* but are binding precedent, we must affirm the district court on alternative grounds.

---

(continued . . .)
because "[t]he power of revocation is tantamount to ownership of the trust property;" therefore, the spouse did not "insulate the trust assets from the jurisdiction of the trial court." *Id*. at 977 (citation omitted).

[11] *Knickerbocker* dealt directly with the effect of a court order prohibiting the transfer of marital property outside the jurisdiction of the court. 912 P.2d at 976. However, our analysis here is not diminished. If *Nelson* applied, then it would have mandated a different outcome in *Knickerbocker* regardless of the court order. We would have placed the home back in the hands of the husband because once the wife died in that case, *Nelson*'s *dictum* would require us to place the parties in the same position as they were before the divorce action was filed. And in *Knickerbocker*, as in this case, the husband and wife were joint tenants, so the husband would have received the wife's interest in the home because of her death. *Id*. at 972.

However, we reject this statement as *dictum*, and reaffirm our holding in *In re Harper's Estate* regarding the effect of the death of a spouse on court orders dealing with property rights.[12] The death of a spouse during a divorce proceeding abates the action concerning the dissolution of the marriage, but it "does not abate the action itself" when certain "property rights" have been determined by the court. *In re Harper's Estate*, 265 P.2d at 1006.

¶27 Conversely, all interlocutory orders that are effective only during litigation abate upon the dismissal of a divorce case. In *Knickerbocker*, the district court ordered that, "[e]ach of the parties is

---

[12] We likewise reject the dissent's contention that all claims arising in a divorce abate under the *Daly* and *Nelson dicta*. The dissent believes that we are reaching beyond the briefing when we abandon this dicta, and are therefore engaging in the same conduct that we reject in our footnote 3. *Infra* ¶ 70. We see the matter differently. While Mother made the very broad statement that there "was no 'debtor-creditor relationship between [Husband] and [Wife]" when the claim was filed, *infra* ¶ 80 n.3, she only ever made the specific argument that there is no debtor-creditor relationship because it abated at the death of Husband. She never questioned whether a property interest could be a claim. Indeed, she conceded as much when she argued that the transfer was fraudulent (as that term is understood under UFTA) at the time Husband transferred the home. *Supra* ¶ 11 n.3. If the transfer was fraudulent at the time it was made, then Mother concedes that Wife necessarily had a valid underlying "claim" at some point. She argues only that it abated. "[W]e are not a depository in which the appealing party may dump the burden of argument and research." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 11, 391 P.3d 196. Nevertheless, the dissent takes the entire burden of argument and research in reaching an issue that was conceded by the appellant.

It is true that Wife never specifically asked us to abandon our *dicta* statements in *Daly* and *Nelson*. However, she put this line of cases at issue by providing specific arguments that certain court orders and claims that arise in a divorce proceeding should survive the death of a spouse. *Supra* ¶ 23 n.7; *infra* ¶ 31. Additionally, she cited secondary sources showing that Utah is nearly alone in its adoption of the standard set forth in *Daly* and *Nelson*. *Supra* ¶ 20; *infra* ¶ 31. Nearly every other jurisdiction follows the rule (or something similar) to that laid out in *In re Harper's Estate*. *Supra* ¶ 20 & n.6.

restrained from selling . . . the assets of the parties . . . during the pendency of this action." 912 P.2d at 976. During the pendency of the divorce action, the wife died and the divorce proceeding "died with" her. *Id.* at 977. The court's order prohibiting the transfer of marital assets abated because it was expressly limited to the "pendency of this action."[13] *Id.* at 976.

### B. Mother Inadequately Briefed Whether a Claim Arising in the Context of a Divorce Proceeding Abates Upon the Death of a Spouse

¶28 While we reaffirm our precedent in *In re Harper's Estate*, we note that this line of precedent addresses only the effect of the death of a party on a court order dealing with property rights. Indeed, Mother expressly argued that the *Nelson v. Davis* line of cases only applies to "those [property] rights granted by the court via an order issued during the divorce." She did not argue that it applied to any claims that could be held by Wife. None of these cases address the effect of the death of a party on a claim for equitable distribution or any other property rights claim. This question appears to be an issue of first impression in Utah.

¶29 "On appeal, the burden is upon the appellant to convince us that the trial court committed error . . . ." *Brigham v. Moon Lake Elec. Ass'n*, 470 P.2d 393, 397 (Utah 1970). When an appellant fails to adequately argue an issue on appeal, she will "almost certainly fail to carry [her] burden of persuasion on appeal." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 12, 391 P.3d 196 (citation omitted). Mother spent the vast majority of her opening brief on whether court orders abate upon the death of a spouse in a divorce proceeding. Concerning claims, rather than court orders, Mother simply stated that Wife "has no currently enforceable claim against Husband" because "Husband is dead" and Wife "cannot haul Husband back into the divorce court." Essentially, Mother argued in her opening brief that no claim exists simply because Husband died. Wife countered by arguing that her property claims "could be brought against the [Husband's] estate." She argues that Utah Rule of Civil Procedure 25 is evidence of the ability to substitute the deceased party with the deceased party's estate. Mother never filed a reply brief explaining why such a claim does not extend to Husband's estate.

¶30 At oral argument, Mother conceded that any claim held by Wife against Husband that survived the abatement of the divorce

---

[13] This is not unique to the area of divorce law. Interlocutory orders that expressly expire at the end of litigation do just that, regardless of the type of case or how the litigation finally ends.

proceeding extended to Husband's estate once he died.[14] We agree. Claims that survive the death of a party are typically chargeable against that party's estate. *See* UTAH R. CIV. P. 25(a)(1) ("If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties."); *Bridgeman v. Bridgeman*, 391 S.E.2d 367, 369 (W. Va. 1990) ("[D]ivorce actions abate at death *except as to property rights. . . . because the award is chargeable against the estate*." (emphasis added)). Yet, Mother's only argument that Wife did not have a claim (rather than court-ordered property rights) against Husband was because she could not haul her dead Husband back into the court to bring such a claim. She did not argue why Wife's property rights claim cannot be brought against Husband's estate.[15] This is fatal.

¶31 The dissent argues that Mother's briefing did not address this issue because Mother "is arguing for a broad rule that doesn't require the nuance now demanded by the majority."[16] *Infra* ¶ 95.

---

[14] The exchange between the court and Mother's counsel went as follows: Question— "if there is a claim that still exists that was not abated by the divorce, might it be a claim involving the husband's estate?" Answer— "Yes your honor, it would be, and in fact [Wife] even admits that on page 11 of her brief that the claim, the demand, now resides with the husband's estate." Oral Argument at 6:19 (April 2017), https://www.utcourts.gov/opinions/streams/sup/.

The dissent argues that Mother's concession in oral argument that the claim extended to Husband's estate was limited by counsel's statement that the claim would extend only if such a claim survived the dismissal of the divorce proceeding. Mother has failed to adequately challenge the trial court's holding that Wife had a claim for the marital estate, including the joint tenancy. We therefore affirm the trial court's holding absent adequate argument. Because we hold that Mother has failed to adequately argue that Wife's claim for the joint tenancy abated when the divorce proceeding was dismissed, Wife's claim for the joint tenancy attached to the estate upon Husband's death, as conceded by both parties.

[15] Mother argued, for the first time in oral arguments, that Wife brought a claim that was barred by the estate. She also argued that Wife's claim should be reduced according to probate law. We address these arguments below.

[16] As mentioned above, the dissent argues that the *Nelson dictum* stands for the proposition that *all* claims arising in a divorce proceeding abate upon the death of a spouse. *See infra* ¶ 60.

(continued . . .)

However, we do not demand this nuanced argument. It is demanded by Wife's counter-argument that property claims brought in a divorce proceeding survive the death of a spouse. She argued that while "the death of a spouse ends the cause of action for divorce and abates any pending action for divorce[,] . . . insofar as a divorce action seeks an adjudication of property rights, the cause of action survives and may be revived." (Quoting 24 AM. JUR. 2d *Divorce & Separation* § 119 (2017)). She further argued that "[c]laims relating to property rights" are not personal, unlike seeking a termination of the marital relationship, and could be brought against the decedent's estate.

¶32 Mother never filed a reply brief and never grappled with this important question. As the appellant, Mother had the burden of establishing that the district court erred. Without adequate briefing from Mother, we do not believe the time is right to rule on this issue. We are rightly hesitant to address an issue of first impression without the aid of adequate adversarial briefing. Mother failed to adequately address the question of whether Wife's claim for the joint tenancy survived the death of Husband and thereby failed to meet her burden on appeal, so we affirm the district court's holding. Because of this, we hold that Wife's claim against Husband for the joint tenancy extended to Husband's estate.[17] The question then becomes whether Wife's claim is somehow barred against the estate or is no longer for the entire marital estate. We do not reach these issues, however, because Mother failed to brief them or to include an adequate record on appeal. She also failed to demonstrate that they were preserved at trial.

*C. Claims Raised by Mother for the First Time During Oral Argument*

¶33 After conceding at oral argument that any claim that survived the death of Husband extended to his estate, Mother alleged for the first time that Wife actually brought a claim against the estate, but that it was disallowed by the personal representative and Wife did not timely seek review by the probate court. Thus, her

---

(continued . . .)

However, we have already addressed this contention and abandoned the *Daly* and *Nelson dicta* and reaffirmed our holding in *In re Harper's Estate*.

[17] Again, we do not hold at this time that equitable distribution or other property claims survive the abatement of a divorce proceeding. We merely state that if they do, then they may be asserted against the decedent's estate.

underlying claim against the estate is time barred. If the underlying claim against the debtor is barred then a UFTA claim against the transferee could be barred as well. *But see Goldberg, Bowen & Co. v. Demick*, 247 P. 261, 263–64 (Cal. Dist. Ct. App. 1926) (holding that statute of limitations defense is personal to the debtor and may not be asserted by the transferee in a fraudulent conveyance action). But Mother raised this argument for the first time during oral argument, and has not identified preservation in the trial court. We do not address issues raised for the first time during oral argument. *Allen v. Friel*, 2008 UT 56, ¶¶ 7–8, 194 P.3d 903 (appellants failing to raise an issue in their opening brief have waived the issue on appeal). This alone is fatal to Mother's arguments.

¶34 Additionally, Mother failed to point to any part of the record before us to support the assertion that a claim against the estate was made, or the result of such a claim. On appeal, "we do not abrogate a [party's] obligation or assume the role of an advocate by researching all applicable law and searching the entire record for each and every indication of possible or potential error." *State v. Honie*, 2002 UT 4, ¶ 67, 57 P.3d 977 (citation omitted). This is especially true where Mother could not confirm what claims were brought by Wife against the estate, when they were brought, or whether a probate court ever addressed those claims. While the Utah Uniform Probate Code provides for different instances in which a claim against an estate may be barred, Mother did not cite to any authority or make any legal argument as to why Wife's claim against the estate is barred. She merely stated that Wife's claim is time barred. In the absence of timely argument or a record on the question of whether Wife's claims against the estate are time barred, we will not assume as much.

¶35 At oral argument, the nature of Wife's claim against the estate—whether it is for the entire marital estate or some lesser amount—was also raised for the first time. Once again, Mother did not raise this issue in her opening brief, nor did she argue how this should affect our analysis during oral arguments, nor point to any will or other evidence in the record to indicate how Wife's claim should be decreased. For these reasons, we do not address this issue.

¶36 "On appeal, the burden is upon the appellant to convince us that the trial court committed error . . . ." *Brigham*, 470 P.2d at 397. Additionally, "when an appellant fails to provide an adequate record on appeal, we presume the regularity of the proceedings below. As this court has previously stated, 'When crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court.'" *State v. Pritchett*, 2003 UT 24,

¶ 13, 69 P.3d 1278 (citation omitted). In this case, Mother is the appellant. Once Wife won in the trial court, the burden shifted to Mother to persuade us, on appeal, that the trial court erred. This included Mother's duty to provide an adequate record. UTAH R. APP. P. 11(e)(2) ("If the appellant intends to urge on appeal that a . . . conclusion is unsupported by . . . the evidence, the appellant shall include in the record a transcript of all evidence relevant to such . . . conclusion. Neither the court nor the appellee is obligated to correct appellant's deficiencies in providing the relevant portions of the transcript."); *id.* 24(a)(9) (an appellant's argument must include "citations to the . . . parts of the record relied on"). Because Mother has failed to provide us with timely argument or to point to the record to challenge the trial court's findings and conclusions, we presume that Wife's claim for the "whole of the marital estate, including the right to preserve the joint tenancy," extended to Husband's estate upon Husband's death, and that this claim is still valid. Based on this, a debtor-creditor relationship existed between Husband's estate and Wife at the time Wife filed her UFTA claim.

¶37 While Wife's underlying claim for the joint tenancy is against Husband's estate, her UFTA claim was brought only against Mother. But Wife's failure to bring her UFTA claim against the estate as well as Mother is not fatal to her claim. Nothing in UFTA requires a fraudulent transfer claim to be brought by the creditor against the debtor. *See Hoesman v. Sheffler*, 886 N.E.2d 622, 627 (Ind. Ct. App. 2008) (noting that "nothing under" Indiana's Fraudulent Transfers Act "indicates that a debtor is a mandatory party"). Indeed, UFTA allows a claim to be brought by the creditor directly against the transferee, even though the transferee was not the party that made the fraudulent transfer. *See* UTAH CODE § 25-6-9(2) ("[J]udgment may be entered against . . . the first transferee of the asset or the person for whose benefit the transfer was made."); *see also Rupp v. Moffo*, 2015 UT 71, ¶ 4, 358 P.3d 1060 (claim brought by bankruptcy trustee directly against transferee without the debtor being added as a party).

¶38 While the debtor does not always need to be added as a defendant, we note that Utah Rule of Civil Procedure 19 applies to UFTA claims, and in a fraudulent transfer case, the underlying debtor is typically a necessary and indispensable party when "the creditor has not reduced [the underlying] claim to judgment." 37 AM. JUR. 2d *Fraudulent Conveyances and Transfers* § 163 (2017 update). This is because the debtor has an interest in proving whether the creditor's underlying claim against the debtor is valid. *See* UTAH R. CIV. P. 19(a) (a person is a necessary party when they have an "interest relating to the subject of the action" and the person will be

"impair[ed] or impede[d]" from protecting that interest if not added). Thus, when the creditor has not already obtained a judgment on the underlying claim, the debtor is typically necessary to "be heard in regard to the validity or amount of the [underlying] claim" that serves as the basis for the UFTA claim. 37 AM. JUR. 2d *Fraudulent Conveyances and Transfers* § 163 (2017 update).

¶39 Mother, however, has not argued on appeal that Husband's estate should be added as a defendant under Utah Rule of Civil Procedure 19, nor did the estate assert an interest pursuant to rule 19. UTAH R. CIV. P. 19(a) ("A person . . . shall be joined as a party in the action if . . . he claims an interest relating to the subject of the action . . . ."). In the trial court, Mother did argue that the estate was an indispensable party, but she only moved to have herself added in her official capacity, as personal representative of Husband's estate, as a plaintiff rather than as a defendant. This would have positioned her both as plaintiff (in her official capacity) and defendant (in her individual capacity) in the case. Wife acquiesced to joining the estate as a *defendant* because the estate "could conceivably assert a claim that would be relevant to the issues of this case," but argued that it made no sense to add the estate as a *plaintiff*. The trial court held that Mother could not add the estate as a plaintiff, but that she could "join herself, in her capacity as personal representative of the decedent's estate, as a second Defendant." Mother (in her individual and official capacities) refused to add the estate as a defendant. Thus, any argument that the estate was a necessary party has clearly been waived.

¶40 While there may be questions about whether Wife's underlying claim is still for the "entire marital estate" and whether any claim against the estate may still be brought, Mother has not adequately raised these issues in her briefing nor provided an adequate record for us to review them on appeal. Without adequate argument that Wife's claim for the joint tenancy abated when Husband died, we refuse to vacate the holding of the district court. Additionally, Mother's concession that any claim "that still exists that was not abated by the divorce" extends to the estate appears to be an accurate statement of the law. Without Mother pointing to anywhere in the record showing that the claim against the estate is barred, we must affirm the district court's holding that Wife had a claim against Husband at the time she filed the current suit. We now turn to whether the trial court erred in granting Wife the entire home rather than money damages.

## II. REMEDIES AVAILABLE UNDER THE UTAH FRAUDULENT TRANSFER ACT

¶41 Utah Code section 25-6-8 provides the remedies available to a creditor when a transfer is fraudulent. Mother argues that section 25-6-8 does not authorize the trial court's holding that Wife "is the sole owner of the [home] in fee simple absolute and that neither [Mother] nor any subsequent transferees have any interest whatsoever in this property." She argues that, while an earlier version of UFTA allowed for a transfer to be voided, the "current version of UFTA now only allows a creditor . . . to obtain a judgment in an amount necessary to satisfy her right to payment based on the value of the property transferred."

¶42 When interpreting a statute, our primary objective is "to ascertain the intent of the legislature." *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (citation omitted). We have consistently stated that "[t]he best evidence of the legislature's intent is the plain language of the statute itself." *Id.* (alteration in original) (citation omitted). Accordingly, "we first look to the plain language of the statute," *id.* (citation omitted), while reading the "the statute as a whole." *State v. Jeffries*, 2009 UT 57, ¶ 11, 217 P.3d 265.

¶43 Prior to 1988, UFTA provided that a fraudulent transfer "shall be void," UTAH CODE § 25-1-8 (1987), and that creditors had the right to "have the conveyance set aside," *id.* § 25-1-15 (1987). In 1988, UFTA was amended, removing the reference to the transfer being void[18] and altering the language describing what remedies are available for a fraudulent transfer. The 2016 version of Utah Code section 25-6-8 reads

> (1) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 25-6-9, may obtain:
>
> (a) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
>
> (b) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Utah Rules of Civil Procedure;

---

[18] While the reference to the transfer being "void" was removed, the 2016 version reads that "a transfer is *voidable*" under Utah Code section 25-6-8(1)(a). UTAH CODE §§ 25-6-9(2) (emphasis added).

    (c) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

    . . .

    (iii) any other relief the circumstances may require.

    (2) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court orders, may levy execution on the asset transferred or its proceeds.

¶44 The trial court granted Wife the home under subsection (1)(a). It held that "the 'extent necessary to satisfy' [Wife's] nascent claims that were created by the filing of the divorce action is to entirely set aside the Transfer." (quoting UTAH CODE § 25-6-8(1)(a)). Section 25-6-8(1)(a), discussing the "avoidance of the transfer," is further clarified by section 25-6-9(2) which provides that,

> to the extent a transfer is *voidable* in an action by a creditor under Subsection 25-6-8(1)(a), the creditor *may* recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less.

(Emphases added).

¶45 Mother argues that this language limits the remedy available under section 25-6-8(1)(a) to a judgment for money damages. However, this interpretation does not comport with the plain language of the statute. Section 25-6-9(2) states that a trial court "*may*" authorize money damages when a "transfer is *voidable*." *Id.* (emphases added). This language gives discretion to the trial court in determining whether to set aside the transfer or to award damages. *See In re Hill*, 374 B.R. 745, 749 (Bankr. S.D. Cal. 2007) (stating that "Congress certainly could have written '*shall* . . .', but instead Congress wrote 'may', which grants this Court discretion."); *Ockey v. Lehmer*, 2008 UT 37, ¶ 18, 189 P.3d 51 (stating that a "deed that is voidable" may be "set . . . aside" by an "injured party"). This interpretation is bolstered by the fact that the legislature specifically allows "avoidance of the transfer" as a remedy. UTAH CODE § 25-6-8(1)(a).

¶46 Husband executed a quit claim deed to Mother. Voiding that deed places title back into the name of Husband. Because we hold that Husband's transfer to Mother was fraudulent under UFTA, the joint tenancy was never severed and Wife likely takes title to the property through the operation of law. *See Hobbs v. Fenton*, 479 P.2d

472, 473 (Utah 1971) (stating that a joint tenancy includes "full rights of survivorship" and that title "automatically vest[s]" in the surviving joint tenant upon the death of the co-tenant).

¶47 We note that Wife only likely takes title because of a procedural oddity which requires remand for further factual findings. Utah Code section 25-6-9(2) provides that "[a] judgment [under subsection 25-6-8(1)(a)] may be entered against: (a) the first transferee of the asset . . .; or (b) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee."

¶48 Just prior to trial on Wife's UFTA claim, Mother transferred her interest in the property to Diamond Fork Land & Livestock Company—a company that appears to be owned by Robert Copier (one of Husband's and Mother's attorneys). The trial court found that this transfer was made in bad faith with the intent to "transfer the subject property beyond the jurisdiction of the court to avoid the remedy sought by [Wife]." Both Diamond Fork and Mr. Copier were added as parties in this action after Wife discovered the transfer, and both defaulted. Thus, we may declare the transfer from Husband to Mother void, and we may also declare the transfer from Mother to Diamond Fork void because Diamond Fork was not a good faith transferee and because it defaulted. *See* UTAH CODE § 25-6-9(2) (stating that judgment may be entered against any "subsequent transferee" so long as they did not take the property in good faith).

¶49 However, we do not know the current status of the title. Diamond Fork apparently attempted to further transfer an interest in the property to another individual, who later "denied claiming any interest in the property." While, based on the record before us, it appears as though no other parties claim an interest from Mother or Diamond Fork, we cannot be sure at this point. If Diamond Fork sold its interest in the property to a good faith buyer, money damages against Mother and Diamond Fork may be the only remedy available under Utah Code section 25-6-8(1)(a). Given the fact that Mother and Mr. Copier appear to have no qualms with transferring the property while this case is pending, we determine that a remand to verify the current status of the title is warranted.

¶50 We therefore remand to the trial court for further factual findings and its determination on this issue. We also take this opportunity to give a word of warning to Mother, Mr. Copier, Diamond Fork Land & Livestock Company, and any other party or attorney who claims an interest in the property. Given Mother's and Mr. Copier's apparent disregard for the courts of this state and the application of justice, we take the odd step as a court of last resort

and order that no party or attorney in this action attempt to further convey this property without approval from the trial court. Mother and Mr. Copier have caused this case to drag on long enough through their dilatory tactics.[19] Another attempt to remove the property from the jurisdiction of the court would warrant the most severe sanctions available.

## III. WIFE'S CLAIM FOR ATTORNEY FEES ON APPEAL

¶51 Wife was granted her attorney fees in the trial court, and seeks attorney fees on appeal. Specifically, she "submits that double attorney fees should be awarded pursuant to" Utah Rule of Appellate Procedure 33. Rule 33 provides two instances in which attorney fees are appropriate: 1) if the appeal is "frivolous," and 2) if the appeal is taken for "delay." If either of these are found, the appellate court "shall award just damages, which may include single or double costs, as defined in Rule 34, and/or reasonable attorney fees, to the prevailing party." UTAH R. APP. P. 33(a). We first note that double *attorney fees* are not available under rule 33, only double *costs* "as defined in Rule 34." Thus, if Wife is entitled to anything, the most she may receiver are her actual attorney fees and double costs. But parties seeking attorney fees under rule 33 face a high bar. "[T]he imposition of such a sanction is a serious matter and only to be used in egregious cases, lest the threat of such sanctions should chill litigants' rights to appeal lower court decisions." *Redd v. Hill*, 2013 UT 35, ¶ 28, 304 P.3d 861.

¶52 Utah Rule of Appellate Procedure 33 defines a frivolous appeal as "one that is not grounded in fact, not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law." We have further clarified that, "[s]anctions are appropriate for appeals obviously without merit, with no reasonable likelihood of success, and which result in the delay of a proper judgment." *Redd*, 2013 UT 35, ¶ 28 (citation omitted). While we ultimately reject Mother's arguments, we cannot say that they are obviously without merit.

---

[19] We note that "[o]n February 22, 2017, the Honorable Kara Pettit . . . entered Findings of Fact, Conclusions of Law and Order disbarring Robert H. Copier from the practice of law . . . ." *Attorney Discipline*, UTAH BAR J., 66 (Nov./Dec. 2017). The record in this case also indicates multiple potential violations of the Utah Rules of Professional conduct.

¶53  However, attorney fees are also available when the appeal is taken for delay. *See* UTAH R. APP. P. 33(a). The trial court held that Mother's "defenses were brought in bad faith, made with the intention of hindering or delaying restoration of the property to [Wife]." Wife argues that this appeal "is but a continuation of the same bad faith litigation" and that it was brought solely to place another *lis pendens* on the property to prevent Wife from selling the home. While the trial court's holding appears to be partially based on its determination that Mother's claims were baseless, it was also based on Mother's trial tactics. For instance, the trial court found that Mother "has filed at least sixty motions during the pendency of this case, many of them repeating previously denied motions, and nearly all with 'little or no citation to legal authority, and little if any real analysis of the legal arguments.'" Also, Mother transferred her interest in the home to her previous attorney "in anticipation of trial," and for the purpose of moving the home "beyond the jurisdiction of the court to avoid the remedy sought by Plaintiff."

¶54 Mother's only argument that this appeal was not brought for any improper purpose is that she has a non-frivolous argument. While a frivolous argument is evidence that the appeal was brought for an improper purpose, it is not the only possible evidence. If it were, awarding attorney fees for "delay" would be completely subsumed by the frivolousness prong. *See Lancer Ins. Co. v. Lake Shore Motor Coach Lines, Inc.*, 2017 UT 8, ¶ 13, 391 P.3d 218 (we interpret rules to give independent meaning to each provision). In this case, Mother appears to have resorted to any method available in the trial court to delay and prevent Wife from acquiring the home. And, on appeal, she failed to directly challenge the trial court's finding that Mother's defenses were brought with the intention of hindering or delaying restoration of the property. This is one of those rare cases in which costs are warranted. We hold that Mother must pay double Wife's costs on appeal, but not her attorney fees. We limit the award because Mother's claim was not frivolous. We remand to the trial court for a determination of those costs. *See DeBry v. Cascade Enters.*, 935 P.2d 499, 503 (Utah 1997) (remanding to trial court for factual determination of double costs and reasonable attorney fees on appeal).

## CONCLUSION

¶55  We conclude that the Utah Fraudulent Transfer Act requires an ongoing debtor-creditor relationship at the time a claim under the Act is filed. In this case, the debtor-creditor relationship existed between Patricia Porenta and Robert Porenta's estate. Because there was an ongoing debtor-creditor relationship, Wife's claim for fraudulent transfer is not barred by the Act. Additionally, we hold

that the trial court did not err in granting Wife the entire marital home rather than money damages, but we remand for a determination of the current status of title. Finally, we award Wife double her costs on appeal and remand to the trial court for a determination of those costs.

———————

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶56    Robert Porenta transferred marital property to his mother (Louise Porenta) while he was going through a divorce with his wife (Patricia Porenta). Robert then died while the divorce case was pending—before a divorce decree issued. Patricia now seeks to recover the property from Louise via a claim under the Utah Fraudulent Transfer Act (UFTA).

¶57    The property transfer was apparently fraudulent under the UFTA at the time of the transfer. But Patricia cannot recover under the UFTA unless she identifies a "claim" (as defined in the UFTA) against Robert at the time she filed her suit. The "claims" that Patricia has identified that could qualify are claims for child support and related claims in the divorce proceeding. Yet those claims were extinguished upon Robert's death, which abated the divorce action. And in Louise's view that precludes Patricia from obtaining any relief under the UFTA.

¶58    The majority disagrees. Looking to the district court order, it starts with the presumption that Patricia had a UFTA-defined claim at the time she filed unless proven otherwise by Louise, citing the appellant's burden of persuasion. It then declines to analyze the validity of that claim under the statute, because it believes Louise did not raise this issue on appeal. Instead, it believes the only threshold question Louise raised was "whether the death of Husband extinguished any debtor-creditor relationship"—in other words, whether the UFTA Claims abated at Robert's death. *Supra* ¶ 11. Ultimately, it determines that Louise failed to adequately address whether the "claims" described by the district court specifically abated when Robert died and the divorce abated. It affirms on that basis.

¶59    I disagree and accordingly dissent. First, I believe that Louise has sufficiently raised the issue of whether the "claims" underlying the district court's holding count under the language of the UFTA. Louise argues that Patricia had no right to payment from Robert at the time she filed her action. Unlike the majority, I don't believe that we can answer this question without deciding whether the district court's supposed "UFTA Claims" were originally valid, whether they abated or not. Second, I believe that any claims that might otherwise have been valid—namely, those arising in the divorce—nonetheless abated at Robert's death. The majority finds nuance here where I find none. Our law has long been clear on this point. Claims arising out of divorce abate upon the death of one of the spouses and the resulting abatement of the divorce. I believe that

Patricia had no valid or surviving UFTA Claim at the time she filed her action, and I would reverse on that basis.

¶60 The majority avoids this result by repudiating a premise of our longstanding case law in this important field—that any right or claim arising from the existence or threat of a divorce proceeding is extinguished upon the death of one of the spouses. This clear, longstanding rule is set forth in a series of our cases. *See In re Estate of Knickerbocker*, 912 P.2d 969, 977 (Utah 1996); *Nelson v. Davis*, 592 P.2d 594, 597 (Utah 1979); *Daly v. Daly*, 533 P.2d 884, 885–86 (1975). And the rule is cast aside by today's majority opinion. That strikes me as problematic. We have no briefing from the parties on the merits or demerits of the principle we reject today. The briefing on both sides of this case accepted the viability of the rule we now reject. I disagree with the court's decision on this point. I would retain the existing rule in a case in which no party has asked us to revisit the clear standard set forth in our cases and the court has not offered a basis for repudiating that rule under the doctrine of *stare decisis*.

I

¶61 The UFTA affords remedies for "creditors" against "debtors" who have engaged in fraudulent transfers of property. *See* UTAH CODE § 25-6-8 (2016) (setting forth the "relief against a transfer or obligation" that "a creditor . . . may obtain"). A creditor, for example, may seek an "avoidance of the transfer . . . to the extent necessary to satisfy the creditor's claim" against the debtor. *Id.* § 25-6-8(1)(a).

¶62 Precision in the use of these terms is crucial to unraveling some of the confusion in the questions presented in this case. One of the key terms with a potential for confusion is the term "claim." To qualify as a creditor under the UFTA a party must have a "claim" against a debtor. The UFTA defines a "Creditor" as "a person who has a claim," and a "Debtor" as "a person who is liable on the claim." *Id.* § 25-6-2(4), (6). This central concept of a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 25-6-2(3). To avoid confusion with run-of-the-mill usages of "claim," I will refer to UFTA-defined claims as "UFTA Claims."

¶63 A claim is a UFTA Claim only if it is against a debtor. *See supra* ¶ 62. Here, that might mean either Robert or Robert's estate. But this is another point of confusion stemming from imprecision in the terms used in this case. In the course of these proceedings we are speaking not only of Robert Porenta and Robert Porenta's estate, but

28

also the "marital estate." The marital estate, however, is quite distinct from Robert Porenta's estate, as explained further below. The marital estate is a *res* or a property interest—not a person or entity who could qualify as a debtor. Only Robert Porenta's estate could qualify as a debtor, as it is only this estate that is a legal person or entity. To keep these points clear, I will refer to Robert Porenta's estate—the entity that succeeded to Robert Porenta's interests—as "Robert's Estate" or the "Estate."

¶64 A threshold question presented is whether Patricia Porenta has a viable UFTA Claim against Robert or his Estate. The majority says that she does. It affirms the district court's determination that Patricia had a "claim for the marital estate, including the joint tenancy." *Supra* ¶ 30 n.14.

¶65 I disagree. Any "claims" the majority or district court may have identified, other than those which arose from the divorce, are not UFTA Claims. The mere intonation of the word "claim" is not enough to satisfy the UFTA. That statute sets forth a limited conception of the kind of "claim" necessary to trigger its application. And the supposed "claim for the whole of the marital estate" does not qualify. The only set of claims asserted by Patricia that *could have* fulfilled the requirements of the UFTA were those that arose in the divorce, and those claims were extinguished upon Robert Porenta's death when the divorce proceedings abated.

¶66 The valid UFTA Claims that were raised by Patricia all abated with the abatement of the divorce. Patricia's claims in divorce made her a "creditor" under the UFTA at the time of the filing of the divorce proceedings: At that point she had a "right to payment" that was "unmatured" and "disputed." *See supra* ¶ 62. But Patricia's divorce claim abated upon the death of her husband. *Nelson v. Davis*, 592 P.2d 594, 597 (Utah 1979); *see also In re Estate of Knickerbocker*, 912 P.2d 969, 977 (Utah 1996). This is a long-settled tenet of our case law. Any right or claim arising from the existence or threat of a divorce proceeding is extinguished upon the death of one of the spouses. *Nelson*, 592 P.2d at 597.

¶67 The majority avoids this problem by overruling *Knickerbocker* and *Nelson* (while purporting only to be clarifying that those articulations of the rule were merely dicta). It then returns to a regime set out in *In re Harper's Estate*, 265 P.2d 1005 (Utah 1954). I cannot concur in this approach for the following reasons.

¶68 First, I am not convinced that *In re Harper's Estate* is on point. The majority cites *In re Harper's Estate* for the proposition that "a court order that divide[s] marital property d[oes] not abate upon the death of a spouse." *Supra* ¶ 20. But *In re Harper's Estate* dealt only

with "divorce decree[s]" that had not yet become final pursuant to Utah Code 1953 section 30-3-6 (now repealed), not orders entered during the pendency of the divorce. These are not identical. The former is a "final judgment in a suit for divorce," which "dissolves the marriage and usu[ally] resolves all matters concerning property and children." *Decree*, BLACK'S LAW DICTIONARY (10th ed. 2014). Orders, on the other hand, might encompass any number of issues arising during the course of a divorce, such as the child support orders discussed here. The rule in *In re Harper's Estate* addresses decrees rather than orders.[1] No such decree was issued in this case. Given that fact, the rule in *In re Harper's Estate* may not even apply.

¶69    Second, even if *In re Harper's Estate* would otherwise apply to this case, it was overruled by *Daly v. Daly*, 533 P.2d 884, 885–86 (Utah 1975). The majority overrules *Daly* and its progeny, calling their relevant language "dicta." *Supra* ¶¶ 21–27. It believes that the holding in *Daly* did not "affect[] the ultimate decision [in *Daly*]." *Supra* ¶ 21. Even if true,[2] the court in *Daly* unequivocally announced

---

[1] This point also diminishes the force of the claim that "[n]early every other jurisdiction follows the rule (or something similar) to that laid out in *In Re Harper's Estate*." *Supra* ¶ 26 n.12; *see, e.g., Bridgeman v. Bridgeman* 391 S.E.2d 367, 369 (W. Va. 1990) (setting out the rule that "divorce actions abate at death except as to property rights" in the context of a divorce decree, rather than an order); *Goodloe v. LaRoche Indus., Inc.*, 686 So. 2d 335, 337–38 (Ala. Civ. App. 1996) (addressing the issue of divorce abatement in the context of a final divorce judgment) *overruled on other grounds by Banks v. Premier Serv. Co.*, 184 So. 3d 370 (Ala. Civ. App. 2014).

[2] While I am not convinced that the pronouncement in *Daly* was dicta, it seems clear to me that the rule in *Nelson* cannot be dicta. The court in *Nelson* addressed an "alternative contention" by the appellant: "even if she does not take by the deed, she should be entitled to her mother's interest in the property as the executrix of her estate and her heir." *Nelson*, 592 P.2d at 597. The court determined that, "[i]n regard to any rights in the property that her mother may have acquired in the divorce action, the principle announced by this Court in the case of [*Daly*] is applicable[.]" *Id.* Whatever *Daly*'s pedigree might be, the *Nelson* court relied on it in disposing of a theory by the appellant. I don't understand how this does not "affect[] the ultimate decision of the case." *Supra* ¶ 21. And I think it unwise for us to cast aside a clearly stated premise of our law

(continued . . .)

a principle that has been relied on as law. If the majority wants to overrule precedent that has been operative for forty years, it should do so on the merits of the case under our standard for overruling precedent. *See Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 21–22, 345 P.3d 553 (identifying the factors for when overruling of a precedent is appropriate).

¶70   Third, no one has asked us to revisit or repudiate the principles set forth in *Daly*, *Nelson*, or *Knickerbocker*. In fact, Patricia cites both *Nelson* and *Knickerbocker* in her brief to this court. She does not ask us to abandon these cases in favor of the principle set forth in *In re Harper's Estate*. Our decision to overhaul the law in this field is likely to come as a big surprise to the parties in this case. And it may upset settled reliance interests in this important field.

¶71   For these three reasons, I respectfully dissent from the majority's repudiation of the principle set forth in the cases following *In re Harper's Estate*. I would uphold the rule that "when the death of one or both parties to a divorce action occurs during the pendency of the action, the action itself abates and their status, including their property rights, reverts to what it had been before the action was filed." *Nelson*, 592 P.2d at 597. And this principle would foreclose Patricia's assertion of a right to sue as a "creditor" protecting a "claim" against a "debtor."

¶72   Patricia *had* a "claim" as her husband's "creditor" at the time of the transfer of the property in question. But that is insufficient. As the majority notes, the UFTA "use[s] the present tense when discussing the [necessary] claim." *Supra* ¶ 12. Thus, the relevant timeframe under the UFTA is clear: "[T]here must be a claim or right to payment held by the creditor against the debtor *at the time a UFTA claim is filed*." *Supra* ¶ 12 (emphasis added). And Patricia accordingly is in no position to assert a UFTA claim on the basis of the cause of action that she filed—and that was subsequently abated—in the divorce proceeding.

¶73   The claims asserted in the divorce proceeding accordingly were not in existence at the time Patricia filed her UFTA action. The majority nonetheless declines to consider whether a claim in fact existed at the time Patricia filed her action. Instead it presumes that the district court correctly identified a surviving UFTA Claim, and

---

(continued . . .)
without any analysis under the doctrine of *stare decisis* or the benefit of briefing from the parties.

faults Louise Porenta for failing to carry her burden of challenging the district court's decision on appeal. But none of the majority's points is persuasive.

A

¶74 The district court held in Patricia's favor, and thus apparently believed that Patricia had a UFTA Claim of some kind. In its order, it set out a few possibilities:

> Plaintiff's claim against Defendant at the time of the transfer encompassed the whole of the marital estate, including the right to preserve the joint tenancy or require Robert to convey his interest free and clear to Patricia. The joint tenancy itself was a marital asset that Robert could not unilaterally dissipate while the divorce was pending.

¶75 Patricia has advanced similar arguments in the district court and in this appeal. She seeks to establish a UFTA Claim on the basis of alleged property interests, asserting that "insofar as a divorce action seeks an adjudication of property rights, the cause of action survives and may be revived by the proper party in interest for the exclusive purpose of determining the property rights." And she contends that these rights could be "brought against the deceased person's estate." In Patricia's view her "property rights had been unchanged during the divorce and were therefore unchanged by dismissal of the divorce action." Thus, Patricia asserts that she "still had, as before, a *marital interest* in the home that she and [Robert] acquired . . . ."

¶76 The majority endorses the approach advanced by Patricia and upheld by the district court. It states that Patricia's "underlying claim against [Robert] was for 'the whole of the marital estate, including the right to preserve the joint tenancy or require [Robert] to convey his interest free and clear to [Patricia].'" *Supra* ¶ 14.

¶77 Patricia has thus identified—and the district court and majority apparently have upheld—three possible grounds for establishing a UFTA Claim: (1) a claim to the "whole of the marital estate"; (2) an interest in or a right to "preserve" the joint tenancy; and (3) a right to require Robert to convey his interest in the joint tenancy to Patricia. Yet none of these is a UFTA Claim—a "right to payment" from Robert or from his Estate. At most the district court identified purported rights or interests that Patricia may be able to assert.

¶78 Some of the cited rights or interests are simply not sustainable under the law. But clearly none qualifies as a "right to

payment" from a debtor. And in any event there is no "debtor" against whom any such claim could be asserted, as Robert is dead and Patricia has not identified any basis for a claim against Robert's Estate.

1

¶79    A "claim to the marital estate" is not a UFTA Claim. A UFTA Claim, again, is a "right to payment." And Patricia has no "right to payment" "*to* the marital estate." (Emphasis added.) That statement makes no logical sense. That tells us there is no UFTA Claim. The asserted "claim to the marital estate" is simply an alleged property interest.

¶80    A property interest is not a UFTA Claim.[3] *See Rosier v. Rosier*, 705 S.E.2d 595, 606–08 (W. Va. 2010) (concluding that "the basis of any 'claim'" under the Uniform Fraudulent Transfer Act "cannot be founded upon whether the affected *property* would have been declared marital property had the [parties] been seeking a divorce prior to [the husband's] death" (emphasis added)). If I own a car it makes no sense to say that I have a "right to payment" in that

---

[3] The majority calls this a "new issue." *Supra* ¶ 11 n.3. But this is exactly the issue that the parties asked us to resolve. Louise argued that there was no "debtor/creditor relationship between [Robert] and [Patricia]." To evaluate that argument, we must decide whether Patricia had a UFTA Claim against Robert. UTAH CODE § 25-6-2 (2016). The district court held, and the majority now affirms, that that UFTA Claim took the form of a "property interest." But that cannot stand under the plain language of the UFTA.

The majority's position highlights a fundamental difference between our respective approaches to this case. The majority presumes that the district court identified a valid UFTA Claim and asks only whether it could have survived. It bases that conclusion on the proposition that Louise's challenge on appeal was limited to the narrow question of survival of the claim. I, on the other hand, believe that Louise's brief—while perhaps underdeveloped— squarely raises the question whether a UFTA Claim exists, for the reasons just stated. A UFTA Claim could "not exist" in two ways: (1) because it existed once but expired (such as the child support payment orders), or (2) because the "claim" identified by the district court never qualified under the statute (such as the "property rights" at issue here). Louise addresses both when she argues that no UFTA Claim existed to validate Patricia's suit. I discuss this further below. *Infra* ¶¶ 92–105.

car. The mere ownership interest is not a right to payment. A right to payment may arise in the event of a transaction involving the car. If I enter into a contract to sell the car then I would have a right to payment. But until then I have only an interest in the car.

¶81　The same goes for an interest in a marital estate. If a married couple owns a home in joint tenancy neither has a "right to payment" against the other. Both just have joint rights or interests. Their rights or interests could be transformed into a right to payment through a claim asserted in a divorce proceeding. But if the divorce abates before such a claim is reduced to a judgment then there is no right to payment.

¶82　That is exactly what happened here. Patricia had an interest in the marital estate. But she had no right to payment. She apparently sought to establish such a right in the claims she filed in divorce, but those claims were extinguished (and the divorce abated) upon Robert's death.

¶83　Robert's death also highlights a further defect in Patricia's case—the lack of a "debtor" for any purported UFTA Claim. Some claims survive the death of the defendant and succeed to the deceased defendant's estate. But other claims do not. *See Gressman v. State*, 2013 UT 63, ¶ 24, 323 P.3d 998 (noting the common law rule of abatement of personal tort claims at death and discussing statutory exceptions to that rule). And Patricia has identified no ground for concluding that her alleged interest in the marital estate amounts to a claim for which the Estate would be liable.

2

¶84　Patricia's interest in or asserted right to prevent Robert from severing the joint tenancy is likewise not a UFTA Claim. This interest or right fails for the reasons that the interest in the marital estate fails—there is no UFTA Claim because there is at most an interest in property, not a right to payment, and there is no debtor because Patricia has not identified a basis for any liability of the Estate on this purported claim.

¶85　There is also a more fundamental problem with this interest: Our law makes clear that there is no right to prevent Robert from severing the joint tenancy. Under Utah law Robert was free to alienate his portion of the property. "It is well-settled that a partial owner" of a joint tenancy "may sell or encumber her share." *Franklin Credit Mgmt. Corp. v. Hanney*, 2011 UT App 213, ¶ 18, 262 P.3d 406 (citation and internal quotation marks omitted). "This is true even when the joint tenants are husband and wife . . . ." *Id.; see also Nelson v. Davis*, 592 P.2d 594, 596 (Utah 1979) ("It is not to be questioned that

a joint tenant may in proper circumstances make a bona fide conveyance of his interest in property to a third party . . . .").

¶86    There is an exception to this general rule. A court may enter an order prohibiting such a transfer during the pendency of a divorce proceeding. *See Nelson*, 592 P.2d at 597; *In re Estate of Knickerbocker*, 912 P.2d 969, 977 (Utah 1996). But there is no suggestion by any party (or the majority) that any such order was entered in the divorce proceedings in this case.[4] And even if such an order had been entered, it would have been extinguished upon the abatement of the divorce case on Robert's death. Even if the right hadn't abated, moreover, the interest in preventing Robert from alienating his share of the property would not rise to the level of a "right to payment" from Robert, and so it couldn't have been a UFTA Claim to begin with.

3

¶87    The right to "require Robert to convey his interest" in the joint tenancy to Patricia also fails for the same reasons. First, there is no legal basis for any supposed right to require Robert to convey his interest. Second, even if there were such a right it could not rise to the level of a "right to payment," and thus would not qualify as a UFTA Claim. And third, there is no "debtor" because Patricia has not identified a basis for any liability on the part of Robert's Estate for the claimed interest in the joint tenancy.

B

¶88    The majority resists the above conclusions without reaching their merits. It does so first by reframing the question presented—asking not whether Patricia has identified a UFTA Claim but "whether [Patricia's] claim is somehow barred against the estate or is no longer for the entire marital estate."[5] *Supra* ¶ 32. This masks the underlying question whether any "claim" at issue qualifies as a

_____

[4] The majority speculates that the reason "there was likely no order entered" was because Robert committed a "fraud on the court." *Supra* ¶ 24 n.9. I am not aware of any basis for such speculation, and I would not do so here.

[5] It is unclear whether the first "estate" in that sentence is referring to Robert's Estate or the marital estate. I assume that it is the former, since the preposition "against" would not make sense if applied to the marital estate, which is not a party and thus cannot have a claim "against" it.

UFTA Claim. There is no UFTA Claim here for all the reasons set forth above. And without a proper UFTA Claim it is irrelevant whether some other property right or interest may be viably alleged against Robert's Estate.

¶89    The majority's next move is to avoid the question presented on the basis of purported missteps of Louise's counsel: (1) counsel's supposed concession at oral argument that Patricia has a claim against Robert's Estate, *supra* ¶ 30; and (2) Louise's alleged failure to adequately brief the issues on appeal. I find no merit to either argument.

1

¶90    The oral argument transcript does not support the court's determination of a concession on Louise's part. Louise's counsel did not concede that Patricia had a UFTA Claim or that any such claim extended to her husband's estate after his death. Instead, in response to probing questions from members of this court, counsel only acknowledged that "*if* there is a claim that still exists that wasn't abated by the divorce," such a claim would transfer to the son's estate. (Emphasis added.) But that doesn't tell us anything about the questions presented—whether there is a valid UFTA Claim and whether any such claim may be asserted against the estate. Counsel for Louise never made a concession on these points.

¶91    In fact counsel argued the contrary. Counsel expressly asserted that there was no UFTA Claim—clarifying that the only "claim" that counts is a "right to payment." And clearly counsel was not conceding that any UFTA Claim would transfer to Robert's Estate. Counsel specifically contended that the only UFTA Claim—claim to a "right to payment"—was in the divorce proceeding, and that such claims were extinguished upon Robert's death.

2

¶92    The record also fails to support the conclusion that Louise failed to contest the district court's holding that Patricia "had a claim for the marital estate, including the joint tenancy." *Supra* ¶ 30 n.14. It says that Louise "did not argue that [the *Nelson* line of cases] applied to any claims that could be held by [Patricia]," but that she instead argued only that the *Nelson* line means that "all *court orders* dealing with property rights abate upon the death of a party." *Supra* ¶¶ 28, 23 n.7 (emphasis in original).

¶93    The majority deems that a fatal briefing error. It says that Louise "never grappled with th[e] important question" of whether Patricia's supposed "claim for the joint tenancy survived the death of

[Robert]." *Supra* ¶ 32. And it rules against Louise on the grounds of "[in]adequate briefing." *Supra* ¶ 32.

¶94 I see the matter differently. I see no way to read Louise's brief in the way the majority does. Perhaps Louise could have framed her position more forcefully or more clearly. But she clearly (and repeatedly) contended that "*any* debtor/creditor relationship that existed between husband and wife during the pendency of the divorce action terminated upon husband's death and subsequent abatement of the divorce action." (Emphasis added.) This general, sweeping argument was made repeatedly in Louise's opening (and only) brief. She argued that there is "no set of facts under which the trial court could have found *the debtor/creditor relationship* between Husband and Wife survived the abatement of the divorce as a matter of law," and that Patricia "has *no currently enforceable claim* against Husband" because she "cannot haul Husband back into the divorce court" to enforce her claims and "the divorce court cannot obtain jurisdiction over him." (Emphasis added.)

¶95 The majority says that Louise only argued that "the divorce court's orders for 'child support and medical and insurance expenses' were vacated" by the husband's death and abatement of the divorce proceeding, or else that only "*court orders* dealing with property rights abate upon the death of a party." *Supra* ¶¶ 15, 23 n.7 (emphasis in original). But that is incorrect for two reasons. First, as noted, Louise was advocating a sweeping rule of abatement that extinguishes *any* claim (or, in other words, any debtor/creditor relationship). To the extent her brief lacks detail it is because she is arguing for a broad rule that doesn't require the nuance now demanded by the majority.

¶96 Second, Louise's brief does in fact address the property claims. Citing *Nelson v. Davis*, 592 P.2d 594 (Utah 1979), Louise asserts that "'when the death of one or both parties to a divorce action occurs during the pendency of the action, the action itself abates and their status, *including their property rights, reverts to what it had been before the action was filed*,'" (quoting *Nelson*, 592 P.2d at 597 (emphasis added)). And in light of this rule, Louise contends that there is no viable property claim asserted in the divorce proceeding. Louise observes that "the 'property rights' which revert upon abatement of [a] divorce action are only those rights 'acquired in the divorce action,' or, in other words, those rights granted by the court via an order issued during the divorce," (quoting *Nelson*, 592 P.2d at 597). She also says that "[t]hese [property] rights abate upon death of one of the parties because the court no longer has jurisdiction over the parties, and without jurisdiction, the court cannot issue a divorce decree"—i.e., a decree awarding property to a party to a divorce

proceeding that is legally abated and thus of no further legal effect. "This is so because one cannot divorce a dead person." *See Farrell v. Porter*, 830 P.2d 299, 302 (Utah Ct. App. 1992).

¶97 The legal and logical grounds for Louise's position strike me as unimpeachable. Patricia asserted both a claim for child support and an asserted property interest in the entire marital estate. But the property claim was a claim in a divorce proceeding—by a wife against a husband. And our case law establishes a general rule of abatement of a divorce proceeding upon the death of a spouse—a rule that forecloses any and all claims for relief that may be asserted within that proceeding.

¶98 I cannot see how the law could be otherwise. Without a spouse subject to the divorce court's jurisdiction there is no party against whom a judgment may be enforced. And without an adverse party there is no viable adversary proceeding.

¶99 Patricia characterizes her property claim as consisting of an alleged "right to benefit from the joint tenancy or to have Husband convey his interest to her." But Robert is dead, and thus cannot be subject to an order of the divorce court addressed to *his* interests in the marital estate. So the property claim *in the divorce proceeding* has no continuing viability; when the UFTA Claim was filed in this case there was no longer any legal basis for this property claim.

¶100 This does not mean that a surviving spouse with asserted property rights is without recourse. Our law, as noted, provides that the parties' "status, including their property rights, reverts to what it had been before the action was filed." *Nelson*, 592 P.2d at 597. And that leaves the surviving spouse with the prerogative of asserting her rights against any party who may claim an adverse interest.

¶101 Patricia raises this argument in her briefing before us. Citing *American Jurisprudence 2d*, she asserts that "'[a]lthough the death of a spouse ends the cause of action for divorce and abates any pending action for divorce, courts have held that insofar as a divorce action seeks an adjudication of property rights, the cause of action survives and may be revived by the proper party in interest for the exclusive purpose of determining the property rights,'" (quoting 24 AM. JUR. 2D *Divorce & Separation* § 119 (2017)). Patricia further notes that the "gist of a divorce action is termination of the marital relationship, a very personal matter, and loss of that person's ability to participate in the litigation was such a prejudice to the case that it would be unjust for the court to proceed to judgment after a party's death." And she seeks to distinguish property claims on this basis, contending that "[c]laims relating to property rights or debts, not

being so personal, *could be brought against the deceased person's estate* or could be brought by the deceased's estate." (Emphasis added.)

¶102  A reply brief addressed to these issues would have been helpful. But I would not conclude that Louise defaulted by failing to address these issues in a reply brief. Her opening brief seems to me to adequately address the question presented—and to identify the proper response to Patricia's argument.

¶103  The principle advocated by Patricia (and apparently embraced by the majority) can easily be accepted without any endorsement of the viability of Patricia's UFTA Claim in this case. Patricia may well have a right to assert an interest in property *against the Estate of Robert*. But that potential interest does not rise to the level of a UFTA Claim. And Patricia has not asserted such a claim or cited it as a basis for this UFTA action.

¶104  The only claims that Patricia cited in her complaint—or at any point below—were claims asserted against Robert in the underlying divorce proceeding. The district court's ruling likewise rested exclusively on claims arising from the filing of a divorce proceeding. Counsel for Patricia conceded this point at oral argument, moreover, acknowledging that the only claim at issue "is a claim based on the marital interest" stemming from the divorce case.

¶105  I would reverse on the ground that the claims identified by Patricia as the basis for her UFTA action were extinguished by the abatement of the divorce action. And I would leave open the possibility (not briefed and not properly presented for our review) that Patricia may yet have other claims not pleaded or argued in this case.

3

¶106  The possibility that Patricia might be able to assert *another sort of claim* that would not be affected by Robert's death is a question raised for the first time by members of this court at oral argument. With that in mind, we can hardly fault Louise for failing to anticipate and respond to that possibility.

¶107  Throughout the proceedings in this case—both in the trial court and in the briefing on appeal—both sides focused their arguments exclusively on the claims arising in the divorce proceeding. In my view, no one ever asserted that a claim unrelated to the divorce might form the basis of Patricia's UFTA Claim.

¶108  It is not our role to speculate on the possibility of such a claim. Perhaps counsel for Patricia will identify one after our decision in this case. But we are not now in a position to opine on the viability of a hypothetical claim that was neither pleaded nor briefed

as the basis for an action under the UFTA. On the pleadings and briefing before us, we are asked only to decide whether Patricia had a viable *divorce* "claim" as a "creditor" under the UFTA at the time she filed this case. And the answer to that question is straightforward: She did not because that claim was extinguished upon the death of her husband.[6]

## II

¶109  I respectfully dissent for the reasons set forth above. I would hold that Patricia is not entitled to any relief under UFTA. And I would accordingly reverse the district court's decision denying Louise's motion to dismiss. I would also reverse the award of attorney fees in Patricia's favor.

--------------------

[6] Robert appears to have made a transfer that was fraudulent when made. But the question presented is not whether we condemn the actions of Robert—or have sympathy for Patricia. It is whether Patricia has asserted a viable claim under the UFTA. If she has not then Louise is entitled to dismissal of this action.

That conclusion would leave for another day the question whether Patricia has other viable claims against Louise that were not asserted herein. Yet it would not leave parties in a divorce proceeding free to thumb their nose at pending court orders. Any transfer in violation of such an order would subject the transferor to contempt charges. And the transferee's interests in the property would be placed in substantial jeopardy. *See Nelson*, 592 P.2d at 597 (when marital property is transferred during a divorce action, transferee takes the property subject to the outcome of that action if she has actual knowledge that the transferor is barred by the underlying litigation from transferring the property); *Hidden Meadows Dev. Co. v. Mills*, 590 P.2d 1244, 1248 (Utah 1979) ("One who takes with full knowledge that the property taken is the subject of on-going litigation acquires only the grantor's interest therein, subject to whatever disposition the court might make of it."); *Timm v. Dewsnup*, 921 P.2d 1381, 1392 (Utah 1996) (transferee taking property subject to a *lis pendens* "acquires only the grantor's interest therein, as determined by the outcome of the litigation" (citing *Hidden Meadows*, 590 P.2d at 1248)).